GULF & S. I. R. Co. *v.* UNITED STATES CAST IRON PIPE & FOUNDRY. CO.

[72 South. 882.]

1. SHIPPING. *Special contract. Offer. Acceptance. Indefiniteness.*

Where in response to an inquiry asking the ocean rates on cast iron pipe from Gulfport to Colon, the agent of a railroad not engaged in ocean transportation quoted a rate on five thousand tons; this at most was only an offer which required acceptance to become binding.

2.  SHIPPING.  *Special contract.  Indefiniteness.*

    A contract simply for a certain ocean freight rate on a certain
      number of tons, not only does not allow division of the shipment
      but is too indefinite to allow the shipper to demand transporta-
      tion by steam, rather than a sailing vessel, and shipment and
      delivery at any certain date.

APPEAL from the chancery court of Hinds county.
HON. O. B. TAYLOR, Chancellor.

Suit by the United States Cast Iron Pipes Foundry
Iron Company.  From a judgment for plaintiff, defend-
ant appeals.

Apellee, who was plaintiff in the court below, re-
covered a judgment against the appellant for damages
in the sum of three thousand, four hundred and ninety-
four dollars and sixty-five cents, based upon losses
suffered by the alleged failure of appellant to carry
out a contract of carriage on a quantity of cast-iron
piping sold by appellee to the Panama Commission.
Appellee alleges that by reason of appellant's failure
to comply with its contract to ship piping from Gulf-
port, Miss., to Colon, Panama, that appellee was com-
pelled to send it *via* New Orleans and pay one dollar
per ton more ocean freight.

The record shows that on October 13, 1911, Morgan,
the district freight agent of the Southern Railway
Company at Chattanoga, Tenn., wired Brown, general
freight agent of the defendant Gulf & Ship Island Rail-
road Company at Gulfport, Miss., as follows:

"Canal Commission calls for bids November sixth
about five thousand tons one-inch cast-iron pipe.  What
is best ocean rate can offer."

To this message Brown wired the following reply
to Morgan:

"Five thousand tons cast iron pipe Gulfport to Colon
two dollars fifty cents net per ton."

On October 19th Morgan wired Brown:

"Your quotation cast-iron pipe Colon error in diam-
eter; should be forty-nine thousand lineal feet twenty-

inch pipe in twelve foot lengths, weighing about one ton to length. How quickly could you handle commencing about December first? What is name steamship line?"

On november 4th Morgan wrote Brown that the appellee foundry company had decided to submit a bid for five thousand tons of pipe called for by the Canal Commission on November 7th—

"on basis of your quotation and also on basis of New Orleans rate of one dollar and ninety cents from Anniston and Birmingham, trusting to the carriers interested to arrange for the same rate to Gulfport as applies to New Orleans. What we are writing you particularly about is to let you know that the bid is to be submitted on this basis and request that you let us have as full information as possible regarding the facilities for handling the pipe from Gulfport to Colon in case U. S. Cast Iron Pipe & Foundry Company are the successful bidders."

The record shows that at that time the rate from Anniston and Birmingham to Gulfport was three dollars per ton as against one dollar and ninety cents to New Orleans. On November 7th Morgan wired Brown that appellee was the successful bidder and would "probably wish to forward pipe your way." Afterwards Morgan wrote Brown that the appellee had been awarded a contract for about two thousand and one hundred tons of pipe, and that he understood arrangements had been made to put in the one dollar and ninety cent rate to Gulfport. He has also advised that the contract with the government called for delivery "one-half in seventy-four days and complete shipment in one hundred and eight days."

Brown wrote the general freight agent of the Southern Railway Company with reference to getting the New Orleans rate applied to Gulfport, but when the application was made the Interstate Commerce Commission denied same on November 27th. Thereafter,

on December 1st, Brown wrote Morgan that this rate had been denied, and that when the rate from Gulfport to Colon was quoted, no specific time within which delivery was to be made was mentioned, and ocean tonnage was hard to get, and that it would probably be impossible to get a steamer to carry the consignment in broken shipments and move the first shipment within the time required. He also advised that he could get a sailing vessel, but Morgan advised him that the contract made with the government required shipment by steamer.

Afterwards the inland rate to Gulfport was fixed to meet the New Orleans rate and became effective December 23d, and appellant avers that if shipped after that date it could not arrive in Gulfport in time to be loaded and shipped to Colon on a sailing vessel and reach its destination by the time required.

On December 14th the pipe company wrote appellant that sailing vessels would not be allowed for the shipment, and that he had therefore been compelled to send the pipe through New Orleans at a cost of one dollar per ton over the rate quoted by appellant from Gulfport to Colon, and that they would look to the appellant for reimbursement. On December 15th appellee wrote appellant that they understood that appellant had abandoned all hope of getting the first shipment through by steamer in time to have it reach Colon on the date required by the contract with the government, and that they had been compelled to arrange to send it *via* New Orleans. This letter reached appellant December 17th. On December 16th, before receipt of this letter, appellant wired appellee that the indications were that a steamer could be obtained about the 26th to leave port January 5th or 6th, and to advise how many tons appellee could get to Gulfport for that shipment, and called attention to the fact that the new rate to Gulfport was not effective until December 23d. On December 20th appellee wrote appellant that they

would be forced to continue shipments *via* New Orleans, as appellant's arrangements were too indefinite, and they could not run the risk of failing to get the pipe to Colon in contract time.

The appellant contends that it never entered into any contract with appellee or any one else to carry their freight from Gulfport to Colon, as it was not in the ocean freight business, but that its first telegram was merely a response to an inquiry from the Southern Railway. It is contended, also, that the amount mentioned in the telegram of inquiry differs from the amount to be shipped by the appellee, and that it was not advised that appellee's shipment was to be made in two installments, and, furthermore, that when the first inquiry was made it was not indicated that time was of the essence of the contract (if it was a contract), and that the requirement of the government forbidding the use of sailing vessels for such shipments was not communicated to appellant, and that the appellee's acceptance of the rate from Gulfport to Colon was entirely contingent upon the action of the Interstate Commerce Commission in meeting the New Orleans rate, and that appellee had contracted with another steamship company out of New Orleans before December 23d, the time when the new inland rate became effective to Gulfport, and that in any event since the first shipment was made by appellant under contract entered into before it could have taken advantage of the rate from Gulfport, appellant is not liable for any loss on that shipment.

*Mayes, Wells, May & Sanders,* for appellant.

*Green & Green,* for appellee.

STEVENS, J., delivered the opinion of the court.

We do not think the decree of the chancellor in this case can be upheld either on the law or the facts. A detailed statement of the history of the controversy between the parties hereto or the facts could be of

no interest to any one except the parties, and therefore without a prolonged discussion of the facts, we state briefly the reasons that impel us to reverse this case.

The initial telegram, in response to which Mr. Brown, the agent of appellant, quoted the ocean rate on the shipment of cast iron in question, constituted an inquiry from the district freight agent of the Southern Railway Company and not an inquiry from appellee or any other shipper. This inquiry simply asked the ocean rate on cast-iron pipe from Gulfport to Colon. Mr. Brown quoted a rate of two dollars and fifty cents net per ton on five thousand tons of cast-iron pipe. The responsive telegram of appellant's agent submitting this quotation consitutes an offer that was in fact never accepted by appellee or any one else. Appellant railroad company in the first place is not engaged in the business of ocean transportation, and this whole record demonstrates that both Mr. Brown and appellee never accepted a written contract of carriage from the Gulf & Ship Island Railroad Company from Gulfport to Colon. There was then no bill of lading or other contract of carriage whereby the Gulf & Ship Island Railroad Company ever obligated itself to transport the iron pipe in question. But conceding that, under the circumstances, appellant was obliged to make good its quotation of an ocean rate of two dollars and 50 cents, the record shows that appellee never intended to ship its pipe *via* Gulfport unless the Interstate Commerce Commission reduced the inland rate much lower than the rate that existed when Mr. Brown made his quotation. It is shown that the combined rail and water rate from appellee's plant to Colon *via* Gulfport was five dollars and fifty cents, while the combined rate *via* New Orleans was five dollars and forty cents. Appellee's bid to the Panama Canal Commission on November 6th could not have been submitted on any certain or fixed basis that allowed a profit without taking the New

Orleans rate as the minimum. It could not know and did not know whether the Interstate Commerce Commission would place the rate to Gulfport on a parity with that of New Orleans, and the first half of the shipment in question was actually made *via* New Orleans before the Interstate Commission made effective the reduction of the inland rate to Gulfport. If it should be conceded that appellant was obliged to make good its quotation, then as to the first half of the shipment actually made by appellee there is no damage whatever shown.

Furthermore, appellant's quotation was upon five thousand tons, whereas the Canal Commission awarded appellee a contract calling for a much smaller quantity, and appellee not only never accepted appellant's offer to carry five thousand tons, but was not in position to ship that quantity at all. We do not think the railroad company is shown to have had notice of the terms and conditions of the contract being awarded by the Canal Commission, and there was never at any time a definite agreement as to the time the shipment was to start or the time it was to be delivered, and certainly no agreement to divide the shipment in two parts. The proof shows that appellant could have secured sailing vessels for appellee's use, but that the use of such vessels was prohibited by the terms of the government's contract with appellee. In the initial telegram quoting the rate nothing was said about the agency to be employed from Gulfport to Colon except that it should be ocean transportation. There is no element of fraud or bad faith in this case. As a matter of fact there was never any definite, binding contract between the parties hereto, no meeting of their minds as to the exact amount of tonnage, the kind of ship, date of shipment, or time of delivery. Under this view of the case there can be no recovery whatever, and the decree of the chancery court is accordingly reversed, and a decree will be entered here in favor of appellant dismissing the suit.

*Reversed.*